IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PATRICIA P. HARRISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:09-CV-229-WKW [WO] |
| | ) |
| ACE AMERICAN INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Before the court are Defendant Ace American Insurance Company's ("Ace") motions to exclude the testimony of Plaintiff Patricia Harrison's expert (Doc. # 29) (*Daubert* motion) and for summary judgment. (Doc. # 32.) This opinion addresses the *Daubert* motion, while the summary judgment motion will be addressed in a separate memorandum opinion.

This case arises from the unexplained death of Mr. William Michael Harrison, whose body was found on the pavement next to his tractor trailer on a two-lane highway in Texas on the morning of May 16, 2006. (Doc. # 30, at 1-2.) Mr. Harrison's position at the time of his death is relevant to determining whether he is covered under the uninsured motorist policy issued by Ace. Ace seeks to exclude the testimony of an expert witness retained by Ms. Harrison, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The motion is due to be denied.

## I.  STANDARD OF REVIEW

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702.  That rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to determine whether proposed expert testimony satisfies the dictates of Rule 702.  The Court explained that the district court's gatekeeping responsibilities require the court to "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592-93.  Essentially, for expert testimony to be admissible, it must be "not only relevant, but reliable." *Id*. at 589. The "relevancy" requirement ensures that an expert's opinion will be helpful to the trier of fact. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).  The "reliability" requirement is designed to exclude so-called "junk science," *Daubert*, 509 U.S. at 593, and ensure that the "knowledge" offered is "more than subjective belief or unsupported speculation." *Id*. at 591.  Expert testimony must be supported by "appropriate validation –

*i.e.*, 'good grounds,' based on what is known."[1]  *Id*. at 590.  "The proponent of expert testimony bears the burden of showing that the expert's methodology is reliable." *Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 540 (11th Cir. 2007).

In assessing an expert's overall reliability, there are three considerations: whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine an issue of fact.

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

Finally, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.  That is, it is not for the court to intrude on the jury's role in weighing the evidence and coming to an ultimate decision.

## II.  BACKGROUND

There are no witnesses to Mr. Harrison's death.  The Texas Department of Public Safety Trooper who investigated his death concluded that Mr. Harrison had parked his tractor-trailer in the northbound lane of Texas State Highway 43 ("SH43"), a two-lane road in Cass County, Texas, at the time of the accident.  (Doc. # 30, Ex. C-1, at 52.)  The Trooper believed that "Mr. Harrison was out of his vehicle and in the southbound lane

---

[1] The *Daubert* Court set out a number of non-exhaustive factors for the court to consider when determining whether a particular scientific methodology is reliable, including "whether it can be (and has been) tested," "the known or potential rate of error," "the existence and maintenance of standards controlling the technique's operation," and whether the technique "has been subjected to peer review and publication."  509 U.S. at 593-94.

when he was struck," and opined that Mr. Harrison was either outside the truck checking a mechanical problem or was lacking "the normal use of his mental and physical faculties at the time of the accident," such as due to substance abuse, heart attack, or stroke, as the Trooper could not understand how it occurred otherwise. (Doc. # 30, Ex. C-1, at 52.) The Trooper noted that a witness had reported, at 1:19 a.m., seeing Mr. Harrison sitting in his truck while stopped at the same place in the roadway, almost five hours before he was believed to be struck. (Doc. # 30, Ex. C-1, at 52.) The Trooper believed that Mr. Harrison may have been out of his truck on his hands and knees trying to flag down a passing motorist for help with a medical problem when he was struck, and that it was possible, given the dawn lighting conditions and Mr. Harrison's position below the line of sight and behind the illuminated headlights of his truck, that the motorist who hit him was unaware that he or she had done so. (Doc. # 30, Ex. C-1, at 52.)[2] While there was blood and brain matter splattered on the roadway, none was found on the truck itself, leading the Trooper to believe that Mr. Harrison was quite low to the ground at the time he was struck. (Doc. # 30, Ex. E, at 4.) Mr. Harrison was 5'7" tall, and his body was found within two to four feet from his truck – that is, within less than one body length of the truck. (Doc. # 30, Ex. E, at 5 (Trooper's affidavit stating that Mr. Harrison's body was

---

[2] At least two newspaper accounts, submitted by Ace, state otherwise. The *Texarkana Gazette*, reported that Mr. Harrison "was learning out of the truck" when struck. (Doc. # 30-3, at 57.) KTBS News reported that Mr. Harrison "was hanging out over the truck" when he was struck. (Doc. # 30-3, at 58.) Both accounts cite as their source Texas Department of Public Safety investigators.

three to four feet from the truck).  *But see* Doc. # 30, Ex. C-3, at 13 (photograph in which the distance appears closer to two to three feet).)

Mr. Harrison's autopsy determined that the cause of his death was "blunt force injuries to the head."  (Doc. # 30, Ex. C-1, at 26.)  The autopsy report states that "[t]he majority of the right side of the head is absent at the level of the right eye and above," and that there were "extensive fractures of the base of the skull and the right side of the calvarium."  (Doc. # 30, Ex. C-1, at 24.)  There was no evidence of preexisting medical problems or substance abuse that could have contributed to an impaired state.

Experts retained by Ace agree with the Trooper's conclusion that Mr. Harrison was not inside his truck at the time of the impact, and their report is submitted as an exhibit. (Doc. # 30, Ex. H-1.)  By contrast, Plaintiff's proposed expert witness, Clifford Prosser, has opined that the accident occurred while Mr. Harrison was leaning out of the driver's side door of his truck, having positioned his head below the door level in order observe the steering action of the front wheels.  (Doc. # 30, Ex. A.)  The relevance of this factual dispute is that the insurance policy issued by Ace to Mr. Harrison's employer, ABC Transportation, Inc., covers persons "'occupying' a covered 'auto' or a temporary substitute for a covered 'auto.'" (Doc. # 30, Ex. J, at 24.)  The policy further defines "occupying" as meaning "in, upon, getting in, on, out or off."  (Doc. # 30, Ex. J, at 27.)

### III. DISCUSSION

#### A. **Daubert**

*1. Mr. Prosser's Qualifications*

Ace's objections to Mr. Prosser focus on the first two of the factors enumerated in *Rink*: his qualifications and his methodology. Ace points out that Mr. Prosser does not hold any academic degree, and claims to be an expert only in accident reconstruction, rather than in "medicine . . . human anatomy, biology, pathology, engineering[,] or the analysis of human bone structure and tissues." (Doc. # 30, at 12.) Mr. Prosser's expertise in accident reconstruction is based on his experience of 14 years as a Birmingham poilce officer with heavy involvement in accident investigations, and nearly 20 years since as an independent investigator and consultant with respect to automobile accidents. He attended a number of law enforcement schools and seminars, at which he received instruction in accident reconstruction, traffic homicides, and retrieval of data from vehicle computer systems. Mr. Prosser now teaches classes in accident reconstruction to law enforcement officers throughout Alabama. (Doc. # 30, Ex. B, at 21-31 (deposition of Clifford Prosser).)

Ace's argument is reminiscent of one rejected, at least in the context of "nonscientific testimony," by the Eleventh Circuit last year. *Am. Gen'l Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009). While the expertise involved in the fields relevant to this case is not as "nonscientifc" as life-insurance risk management, the topic in *American General*, the court is also far from convinced that, on the record before it, the

hypothetical reconstruction of what happened to Mr. Harrison on SH43 in May 2006 is equivalent to pure science, such that particular academic qualifications are required. In an important post-*Daubert* decision, the Supreme Court noted that "there are different kinds of experts, and many different kinds of expertise," and further that "the relevant reliability concerns may focus upon personal knowledge or experience," depending on the nature of the case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).[3]

Ace does not dispute that Mr. Prosser has considerable "personal knowledge [and] experience" of accident reconstruction, as well as at least some training in the effects of accidents involving the human body, as the result of his vehicular homicide training. Its point that Mr. Prosser lacks qualifications in a litany of other fields is one it may argue to the jury, but the relevance to *Daubert* is unclear. For example, does Ace contend that, in order to testify, Mr. Prosser must be an expert in each of the fields of "medicine . . . human anatomy, biology, pathology, engineering[,] or the analysis of human bone structure and tissues"? Or, to quote a different list offered by Ace, that he must be an expert in "biomechanics, injury biomechanics, biomedical engineering[,] or mechanical engineering"? (Doc. # 30, at 17.) Of these eleven fields (many seem related, but it is Ace that lists them

---

[3] Notably, *Kumho Tire* itself involved "an expert in tire failure analysis," a field the Court characterized as belonging to "experts who are not scientists." 526 U.S. at 141. *Kumho Tire* held that while the basic precepts of *Daubert* remain relevant to such nonscientific expert testimony, "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id*.

7

separately), it is not clear which would be relevant to Mr. Prosser's qualifications to render an opinion in this case.

Ace also makes much of Mr. Prosser's agreement with or failure to dispute most of the findings of the Trooper or of the autopsy report. But in many respects, it is the limited scope of Mr. Prosser's proposed testimony that makes it admissible. Were Mr. Prosser to take issue with the findings of the doctor who conducted Mr. Harrison's autopsy, or engage in protracted analysis of the body fluid spatter pattern found on the roadway, that testimony would likely be excludable due to his lack of qualifications in those specific fields. But Mr. Prosser proposes only to offer an explanation, given the facts at hand, of how Mr. Harrison could have been initially struck by a passing vehicle while still maintaining contact with his the truck cab. At trial, there is plainly room for Ace to exploit these weaknesses in Ms. Harrison's case, but the *failure* to offer an opinion about a subject on which one is *not* an expert cannot be a basis for exclusion under *Daubert*. Based on his experience, Mr. Prosser is sufficiently qualified to offer an opinion on the issues concerning which he seeks to testify.

### 2. *Methodology*

Somewhat more compelling is Ace's argument that Mr. Prosser's methodology in reaching his conclusions is insufficiently "reliable" to pass muster under *Daubert*. The *Rink* court listed four considerations in a determination of reliability: (1) "whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subject to peer review and publication; (3) whether the method has a known rate of error; (4) whether

the technique is generally accepted by the scientific community." *Rink*, 400 F.3d at 1292. In *Rink*, however, there was no question that the expert testimony offered was "scientific" in nature; it concerned a toxicology analysis of the manner in which workers were exposed to certain pesticides, and the effects resulting from such exposure. *Id*. at 1289-90. The court found the methodology flawed because of such mistakes as "the facile transposition of temperature data from one site to another," that is, the unsupported assumption that the temperatures at sites in Texas, Florida, and Georgia were the same based on a measure of the temperature at a single site. *Id*. at 1292. The expert also made the bare assertion that 18 degrees should be added to the temperatures observed, based on his unexplained theorizing about the likely effects of "radiant energy from the sun or an autocatalytic effect." *Id*. These problems in methodology made the expert's testimony fundamentally unreliable under *Daubert*.

In *Kumho Tire*, the Supreme Court noted that, just as district courts have latitude in determining relevant qualifications, they "must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability." 526 U.S. at 152 (emphasis in the original). The latitude exists both in determining how to test reliability and in the "ultimate conclusion" about whether a methodology is reliable. *Id*. at 152-53.

The field of accident reconstruction, at least in terms of Mr. Prosser's proposed testimony, appears to have much more in common with tire-failure analysis than with

9

toxicology. It is not clear to the court how any "theory" of accident reconstruction could have an error rate or be capable of peer review in the sense that an article in a medical journal is reviewable. Ace does not point to any *Rink*-style unexplained suppositions or obvious leaps in procedural logic. Mr. Prosser's theory is obviously somewhat speculative and may well be rejected by the jury, based on Ace's contrary evidence. But the court cannot imagine what theory of Mr. Harrison's death would *not* be somewhat speculative, given the paucity of facts available about his final moments.[4]

The court also disagrees with the suggestion that because Ace has conducted a test purporting to show that Mr. Prosser's theory is implausible, the theory therefore has a "100%" error rate and should be rejected. (Doc. # 30, at 15.) Testing conducted by one party to a lawsuit for purposes of litigation is not the equivalent of peer review, and while the simulated test conducted by Ace may be powerful evidence when presented to a jury, it is not evidence Mr. Prosser's "methodology" is inherently unreliable; it simply takes issue with his conclusion. That is a matter for a jury's consideration.

---

[4] As far as the court can discern from the submissions in the record, the universe of facts concerning the physical location of Mr. Harrison's body in relation to his truck at the time of the fatal injury are as follows: (1) the truck was stopped in the normal driving lane of a two-lane highway with the engine off and the lights on; (2) the truck wheels were turned to the left; (3) Mr. Harrison's body was found in the roadway two to three feet from his truck, on the driver's side, positioned generally parallel to the truck; (4) Mr. Harrison was 67 inches tall; (5) Mr. Harrison had a traumatic head injury, with spatter of body fluids towards the underside and rear of the truck; (6) there was no spatter on the truck itself; and (7) his body was found early in the morning.
  Whether the driver's side door on the truck was closed when Mr. Harrison's body was discovered has not been clearly established on this record. It was closed in the photographs, but the accident report contains information that could be recovered only from inside the cab of the truck, by an investigator who would have entered the truck by one door or another. The accident report is silent as to whether the driver's door was found open or closed.

Accordingly, upon consideration of the nature of this case and the absence of established facts from which any expert could draw firm conclusions, or have his methods tested or peer reviewed, the court concludes that Mr. Prosser's methodology meets the minimum standards of *Daubert*, on the record before the court.  The motion to exclude his testimony is due to be denied.

### IV. CONCLUSION

For the foregoing reasons, it is ORDERED that the motion to exclude Mr. Prosser's testimony (Doc. # 29) is DENIED.

DONE this 8th day of July, 2010.

                                                /s/ W. Keith Watkins
                                       UNITED STATES DISTRICT JUDGE